THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-215

TERI KIMBRO                                                              PLAINTIFF

V.

COMMONWEALTH OF KENTUCKY,
DEPARTMENT OF PUBLIC ADVOCACY                              DEFENDANT

MEMORANDUM OPINION

This matter is before the Court on competing motions for summary judgment.  Plaintiff

has filed a motion for partial summary judgment as to liability.  (Docket #12).  Defendant has

responded.  (Docket #15).  Plaintiff has replied.  (Docket #17).  Defendant has filed a motion for

summary judgment.  (Docket #13).  Plaintiff has responded.  (Docket #14).  Defendant has

replied.  (Docket #16).  For the following reasons, Plaintiff's motion for partial summary

judgment (Docket #12) will be DENIED and Defendant's motion for summary judgment

(Docket #13) will be GRANTED.

BACKGROUND

This case arises out of Plaintiff Teri Kimbro's employment at Defendant Commonwealth

of Kentucky, Department of Public Advocacy (the "DPA").  Kimbro suffers from respiratory

issues including asthma and bouts of bronchitis and pneumonia.  Kimbro claims she was

constructively discharged by the DPA when the DPA failed to reasonably accommodate her

health issues by allowing her to close her office door while an air filter was running.  (Docket

#12).  The DPA responds that Kimbro voluntarily resigned and did not engage in a good faith

interactive dialogue with the DPA about her health concerns.  (Docket #13).

Kimbro worked as a legal secretary for the Paducah office of the DPA from January 1, 2006 until November 24, 2012.  For the first six months of her employment, Kimbro worked in an administrative specialist's office while covering for an employee on maternity leave.  Kimbro then assumed a departing employee's office and responsibilities, which in large part consisted of transcribing witness statements, hearings, and interviews.  Approximately half of Kimbro's time was spent transcribing, while she also answered phones, archived closed files, ran errands at the courthouse, and greeted visitors when the receptionist was away.  While Kimbro was transcribing, she was allowed to close her office door to shut out distractions, but otherwise the DPA required Kimbro to keep her office door open.  (Docket #12).

In 2008, the DPA renovated its offices.  Kimbro was assigned an office near the front of the building.  Chris McNeill, the Directing Attorney for the DPA's Paducah office, testified that Kimbro's new office was designed to have a view of the reception area while Kimbro's door was open.  (Docket #13).  McNeill allowed Kimbro to shut her door while she was transcribing but otherwise preferred her door be open so that she could greet visitors when necessary and so that the DPA attorneys could come into her office with assignments without feeling that they were interrupting her work transcribing.  (Docket #13).

In the fall of 2007, Kimbro experienced her first bout of bronchitis.  In the spring of 2008, Kimbro met with Dr. Frank Block, who diagnosed her with seasonal allergic rhinitis and noted she was allergic to mold and certain weeds.  (Docket #12).  Kimbro attempted to remove allergens in her home by removing carpet, pets, using hypoallergenic bedding, drying out her basement, and using air purifiers.  (Docket #12).  Kimbro did smoke periodically and quit and restarted smoking multiple times during her employment with the DPA.  (Docket #13-3, p. 12).[1]

---

[1] Kimbro stated she smoked "[o]ccassionally" during the summer of 2012.  (Docket #13-3, p. 12).

Kimbro suffered ongoing respiratory problems including twenty-six bouts of bronchitis and two bouts of pneumonia while employed at the DPA.  From 2007 onward, each year Kimbro exceeded her annual allotment of sick leave.  (Docket #12).

In February, 2012, Kimbro began regularly closing her door, even while not transcribing.  Kimbro had purchased an air filter for her office and closed her door in an attempt to boost its efficacy.  Kimbro did not initially inform McNeill that she was keeping her door closed for this purpose.  (Docket #13-3, p. 18).  On May 17, 2012, McNeill conducted a regular review of Kimbro's work.  During the review, McNeill stated his preference that Kimbro keep her office door open unless she was transcribing.  McNeill was concerned that Kimbro was not performing her work while her office door was closed and that attorneys were reluctant to interrupt her with assignments.  (Docket #15).  The following day, Kimbro sent an e-mail to McNeill stating she intended to request an ADA accommodation from McNeill's supervisor, Eric Stovall.  Kimbro also stated her intention to provide medical records documenting her illness.  (Docket 13-3, p. 49).  McNeill forwarded this e-mail onto Stovall. (Docket #15).

Following this e-mail, the DPA decided to conduct an air quality assessment.  (Docket #13-3, p. 49-50).  The DPA informed Kimbro that she could keep her office door shut at all times pending the outcome of the air quality assessment, and Kimbro did so.  Kimbro did not make an ADA accommodation request because "at the time, I was getting what I asked for." (Docket #13-3, p. 23).

Ensafe performed an air quality assessment which concluded that, except for one office, the "total fungal spore results of the indoor bioaerosol air samples were lower than the outdoor (exterior) sample."  (Docket #13-2, p. 98).  The exterior sample showed 32,000 total fungal spores per cubic meter of air.  Kimbro's office registered at 1,600 and the other offices ranged

between 2,600 and 7,700, except for one room in the back of the building which had an active water leak and showed 81,000 total fungal spores per cubic meter of air.  (Docket #13-2, p. 101).

On September 27, 2012, during another regular review of Kimbro's work, McNeill informed Kimbro of the results of the air quality assessment.  McNeill told Kimbro that because the air quality assessment results came back normal, Kimbro would need to return to keeping her door open.  McNeill and Kimbro discussed this policy and Kimbro understood that McNeill was open to reconsidering it if Kimbro became ill again.  (Docket #13-3, p. 24).

On November 7, 2012, Kimbro had an argument with a fellow co-worker.  Following the argument, Kimbro began packing up personal items from her desk.  Kimbro stated she "was mad and was packing up like I'm mad, but I hadn't decided for sure what I was doing yet."  (Docket #13-3, p. 28).  Kimbro was absent the following day.  Kimbro stated she was sick from "finishing up like another round of antibiotics and steroids" and was also "burned out."  (Docket #13-3, p. 26).  Kimbro sent an e-mail to McNeill informing him that she was resigning.  On November 9, 2012, Kimbro went into the office and met with McNeill to confirm her resignation.  Kimbro admits that McNeill tried to persuade her not to quit.  (Docket #13-3, p. 27).  Kimbro also acknowledges that the issue of her keeping her door closed was not discussed during her resignation meeting.  (Docket #13-3, p. 27).  The DPA requested that Kimbro write a resignation letter, which she did.  In the letter, Kimbro stated she was resigning to "focus on my health, my education, and my family."  (Docket #13-3, p. 57).  Kimbro also expressed a desire to complete her master's degree, which she accomplished the following year.  (Docket #13-3, p. 28).

Kimbro filed this action claiming the DPA failed to reasonably accommodate her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(4), and the Kentucky Civil Rights Act ("KCRA").

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The discrimination covered under the Act includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).

 "Because the language of the KCRA [Kentucky Civil Rights Act] mirrors that of its federal counterpart," courts analyze a disability discrimination claim brought under the KCRA by the "framework provided by the Americans with Disabilities Act."  *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 730 (W.D. Ky. 2013);  *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003).

The elements of a prima facie disability discrimination claim are: (1) Plaintiff is disabled, (2) Plaintiff is otherwise qualified for the position, with or without reasonable accommodation; (3) Defendant knew or had reason to know about Plaintiff's disability; (4) Plaintiff requested an accommodation; and (5) Defendant failed to provide the accommodation.  *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999).

The Court will discuss:  (I) whether Kimbro was a qualified individual with a disability; (II) whether Kimbro engaged in the interactive process in good faith; (III) Kimbro's claim that she was constructively discharged; and (IV) Kimbro's claim for retaliation.

## I.      Qualified Individual with a Disability.

The term "disability" includes "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S. Code § 12102 (1)  "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S. Code § 12102(2).  Therefore,

"[a]n employee demonstrates disability for purposes of the ADA by showing a substantial limitation on a major life activity, not necessarily the major life activity of working." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir. 1998).

Kimbro claims that her respiratory issues and "positive test for Antinuclear antibody" have resulted in "difficulty breathing, persistent and prolonged coughing, difficulty concentrating, chest pain, lethargy, fatigue, and swelling of the hands and feet." (Docket #17). Kimbro claims she is a qualified individual with a disability because she has shown a substantial limitation on her ability to breathe, which is a major life activity. In response, the DPA argues that Kimbro has not demonstrated a work restriction or otherwise "alleged how her ability to perform any function of her job was limited." (Docket #15).

The "primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. §1630.2(j)(1)(iii). "Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id*. With the recent amendments to the ADA, Congress "outright rejected the Supreme Court's directive . . . that the ADA's terms should be interpreted strictly to create a demanding standard for qualifying as disabled." (citation and punctuation omitted) *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488 *13 (6th Cir. 2008) (unpublished). "Instead, Congress now tells us that '[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under this Act.'" *Id*. (*quoting* Pub. L. No. 110-325, § 4(4)(A)).

The DPA relies on this Court's decision in *Azzam*, in which this Court found a nurse who had suffered a stroke was not disabled. *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp.

2d 653, 658-61 (W.D. Ky. 2012).   That case is distinguishable because that plaintiff claimed to be limited in the major life activity of working, which is defined as the inability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i) (2010).  The *Azzam* court found that plaintiff was not disabled because she was able to return to work, with the exception of being on call for nights and weekends. *Azzam*, 855 F. Supp. 2d at 661 (finding Azzam nevertheless disabled because she was "regarded as" disabled by her employer).  Furthermore, the "determination of whether an impairment substantially limits a major life activity requires an individualized assessment," and therefore the facts of any one case may at best be instructive of an unrelated case.  29 CFR 1630.2(j)(1)(iv).

Kimbro has presented medical proof that she suffered from respiratory problems that impaired her ability to breathe, a major life activity.  In light of the Congress's intent to provide broad coverage under the ADA, the Court finds Kimbro has provided sufficient proof.  *See e.g. Gesegnet v. J.B. Hunt Transp., Inc.*, 2011 U.S. Dist. LEXIS 57537 (W.D. Ky. 2011) ("The Court doubts that the medical and personal evidence here is sufficient to show an actual inability to perform a basic function of life.  Nevertheless, given the broad definition of disability Congress intended, the Court will assume that Plaintiff has a disability under the ADAAA).

## II.      Duty to Engage in the Interactive Process in Good Faith.

The ADA encourages an employer and employee to engage in an "informal, interactive process" to "determine the appropriate reasonable accommodation."  29 CFR 1630.2(o)(3).  The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Id*.  "Accordingly, the interactive process requires communication and good-faith exploration of possible

8

accommodations." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007) (citation and punctuation omitted). "[T]he interactive process is mandatory, and both parties have a duty to participate in good faith." *Id.* (collecting cases). "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* (*quoting Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 128, 1285 (7th Cir.).

In this case, the Court finds the DPA engaged in the interactive process in good faith, whereas Kimbro did not. While Kimbro complains of respiratory problems during her six years of employment at the DPA, it was not until her final year of employment that she began the process of seeking an accommodation. In February, 2012, Kimbro unilaterally implemented an accommodation – closing her door while an air filter ran in her office – without first discussing it with the DPA. On May 17, 2012, during a routine review, McNeill instructed Kimbro to keep her door open while not transcribing. The following day, Kimbro sent McNeill an e-mail stating her intention to seek an ADA accommodation and claiming she would provide medical documentation of her illness. The DPA decided to conduct an air quality assessment and informed Kimbro she could keep her office door closed pending the results of that assessment, which she did. (Docket #13-3, p. 23-24). During Kimbro's next routine review in September, McNeill informed her that the air quality assessment showed a significantly lower concentration of mold in her office than outdoors and instructed Kimbro to keep her door open while she was not transcribing. Kimbro and McNeill also discussed her proposed accommodation and Kimbro understood that McNeill may reconsider his position if she began "getting seriously ill again." (Docket #13-3, p. 24). On November 7, 2012, Kimbro got into an argument with another employee. Kimbro sent McNeill a resignation e-mail the following day and told McNeill in

person on November 9.  (Docket #13-3, p. 26-27).  Kimbro admits that McNeill attempted to persuade her to continue working.  (Docket #13-3, p. 27).  Kimbro also admits that during her resignation meeting, she did not discuss her proposed accommodation of keeping her office door closed.  (Docket #13-3, p. 27).

Kimbro did not engage in the interactive process in good faith because she never documented her medical condition, never followed up her intention to request an ADA accommodation, appears to have resigned for reasons unrelated to her respiratory problems, and rebuffed the DPA's attempt to persuade her not to resign.  Conversely, the DPA fulfilled its duty to engage in good faith by ordering an air quality assessment to investigate Kimbro's concern, allowing Kimbro to close her door pending the results of that assessment, and attempting to persuade Kimbro not to resign.  An employee who fails to engage in the interactive process in good faith cannot maintain a claim of disability discrimination.  *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 690-93 (E.D. Ky. 2014).  Conversely, "[t]o bear liability for a failure to accommodate, an employer must be responsible for a breakdown in the interactive process." *Lockard v. GMC*, 52 Fed. Appx. 782, 788 (6th Cir. 2002) (unpublished); *see also EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014).

### III.   Claim of Constructive Discharge.

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).  "However, 'resignations and retirements are presumed to be voluntary.  An apparently voluntary resignation does not rise to the level of a constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances.'"

*Harvey v. America's Collectibles Network, Inc.*, 2011 U.S. Dist. LEXIS 5662 *27 (E.D. Tenn. 2011) (*quoting Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004)).  "A constructive discharge claim 'depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee.'"  *Talley v. Family Dollar Stores of Ohio, Inc.*, 2008 U.S. App. LEXIS 19342 *16-17 (6th Cir. 2008) (*quoting Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004)).

In this case, Kimbro cannot establish a constructive discharge claim because Kimbro has not established that the DPA violated the ADA and thereby created an intolerable working condition.  *Chavez v. Waterford Sch. Dist.*, 720 F. Supp. 2d 845, 858 (E.D. Mich. 2010) ("In order to support a claim for constructive discharge, however, there must first be an underlying cause of action for some type of employment discrimination"); *Talley*, 2008 U.S. App. LEXIS 19342 at *21-22.

## IV.     Retaliation.

"To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action."  *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).  "If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action."  *Id.*  The employer must then offer a legitimate, nondiscriminatory reason for its action.  *See Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).  If the employer satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual.  *Id.*

In this case, Kimbro is unable to establish a prima facie case of retaliation because Kimbro cannot show that she suffered an adverse employment action. *Harvey,* 2011 U.S. Dist. LEXIS 5662 at *31-32 ("Plaintiff has not demonstrated that she was constructively discharged. Without that showing, there is no adverse employment action to sustain a claim for retaliation under the ADA, and summary judgment is appropriate").

CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Docket #12) will be DENIED and Defendant's motion for summary judgment (Docket #13) will be GRANTED.

A separate judgment and order shall issue.